UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

TIFFANIE HUPP et. al,

     *Plaintiffs,*

v.

STATE TROOPER SETH COOK, et. al,

     *Defendants.*

Case No: 2:17-CV-926

JURY TRIAL REQUESTED

## RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

#### A.    *Overview*

Tpr. Cook entered a yard unreasonably, pointed a gun at a friendly leashed dog named Buddy who was wagging his tail, and arrested Tiffanie Hupp for asking him not to shoot. *See, e.g.*, Video of Incident (Doc. No. 90-6). When Cook learned he was caught on tape, he entered the house without a warrant and indiscriminately seized electronic devices, threatening a pregnant woman with jail if she didn't comply. Next, Cook lied in his Criminal Complaint (Doc. No. 90-12), in his request for a Search Warrant (Response Ex. A), and at trial. The jury didn't buy it, swiftly acquitting Hupp.

The defendants, Tpr. Cook and Col. Smithers, suggest Cook's behavior was by the book, a model for future troopers to follow. And they argue qualified immunity shields them from responsibility. But their arguments wither in the light of facts, law, and common sense.

The defense's own paid expert has broken ranks. Despite admitting that his personal

ethical considerations preclude him from ever testifying against a fellow law enforcement officer, and having testified in roughly 400 cases, Faulkner declared that nearly every claim in this case presents a jury question. Response Ex. B, Faulkner Dep. Tr. at 31, 36, 72, 88, 113–14, 123–24; Faulkner Expert Rep. (Doc. 90-20) at 8. He repeatedly explained that whether or not actions were "reasonable" was ultimately going to require a jury because even he couldn't bring himself to say the situation was easy or clear. Faulkner Dep. Tr. at 123–24; Faulkner Expert Rep. at 8.

The defense expert is correct that no claims can be resolved in favor of the defendants at the summary judgment this stage. That said, as described in the Plaintiffs' Memorandum (Doc. No. 91) in Support of their Motion for Summary Judgment (Doc. No. 90), some claims can be resolved in favor of the plaintiffs at this stage. This Response to the Defendants' Motion for Summary Judgment (Doc. No. 92) focuses on the evidence which defeats summary judgment for the defendants. Crediting the evidence that Cook violated well-established Constitutional rights and that Smithers allowed, approved of, and ratified the same, a reasonable jury could conclude that the defendants are liable on all claims, and unprotected by qualified immunity.

The remainder of this Introduction summarizes the plaintiffs' arguments. Evidentiary citations are provided in the Detailed Statement of Facts, section II, *infra*.

B.    *Summaries of Facts and Law*

1.   UNLAWFUL ARREST, EXCESSIVE FORCE, EMOTIONAL DISTRESS, BATTERY, AND DOG SEIZURE

<u>Facts:</u> Cook entered Clifford Myers's yard without justification or need, approached Buddy voluntarily, and then drew his gun on Buddy. He did this while Buddy wagged his tail, leashed, and not approaching. He directed those present to control the dog. Hupp walked down

the hill and asked Cook not to shoot. Cook responded by grabbing her, throwing her to the ground, and arresting her. Cook's use of force resulted in severe pain and a bruise, and required medical treatment. See Camden Clark Medical Docs. (Docs. Nos. 90-9–10) at 4, 26–27, 34, 52. Hupp's actions likely saved Buddy's life, as Cook once shot a dog, claiming the dog was a threat, even though the dog was mortally wounded and could not use his back legs. Cook Dep. Tr. (Doc. No. 90-7) at 59–61. Tiffanie Hupp's young child, Riley, was subjected to this. *See* Video of Incident at 3:18–26; Tiffanie Hupp Dep. Tr. (Doc. No. 90-5) at 16–18.

Legal Implications: An officer cannot arrest someone or use force against her when she has done nothing wrong. Where the plaintiff "committed no crime," by alleging force on the part of the officer, "the plaintiff had stated a claim for violation of [her] constitutional right to be free from excessive force." *Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003); *see also Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (recognizing de minimus force as excessive when arrest unlawful). This applies to battering and arresting a citizen when she was standing with their hands by their side, asking an officer not to shoot her family's dog. Furthermore, Cook had no basis upon which to pull his gun on Buddy in the first place.

Conclusion: The defense Motion must be denied as to excessive force, unlawful arrest, battery, intentional infliction of emotional distress, and Buddy's seizure, Counts I, II, VII, VIII, and XI.

## 2. UNLAWFUL ENTRY AND ILLEGAL SEIZURE

Facts: Tiffanie Hupp, while shoved against the police car by Cook, cried for help. Video of Incident at 2:23–24. According to Cook, Ryan Hupp responded, "Don't worry babe. I got that shit," referring to the recording he made of the incident. Cook Dep. Tr. at 71. At this moment,

3

Cook learned he was caught on tape. Cook admits he understood that Ryan Hupp would not destroy the Video evidence. Cook Dep. Tr. at 74. At that point, Cook entered Clifford Myers's home with neither consent nor a warrant. *See* Crim. Compl. at 3 (explaining Cook's actions and lacking any mention of consent). He ordered the Myers's pregnant daughter to come out of the bedroom or she would be arrested. Dalton Myers Dep. Tr. (Doc. No. 90-13) at 38. Then he took four electronic devices, including a child's tablet. Clifford Myers Dep. Tr. (Doc. No. 90-4) at 79–80; Cook Dep. Tr. at 73.

Legal Implication: A warrantless home search presumptively violates Constitutional rights. The facts affirmatively show the *absence* of exigency here.

Conclusion: The defense Motion must be denied as to unlawful search and seizure of Myers's home and cell phone, Counts IX–X.

3. Malicious Prosecution

Facts: Tpr. Cook filed a Criminal Complaint to make sure Hupp was prosecuted. In it, he asserted that Buddy was "growling and approaching." Crim. Compl. That was a lie. *See* Video of Incident at 1:25–30; *see also* Cook Dep. Tr. at 35 (admitting Buddy not advancing). He asserted at trial that Buddy was snapping his jaw. Trial Tr. at 51. That was a lie. *See* Video of Incident at 1:25–31; *see also* Response Ex. C, Crosby Dep. Tr. at 93 (explaining Buddy's behavior on camera is indicative of his behavior a moment earlier, because aggressive dogs cannot "just turn that off" in an instant). He testified that, after Hupp approached, he gave her multiple orders and she argued back. Trial Tr. at 52. That was a lie. *See* Video of Incident at 1:28–29 (showing insufficient time for such a conversation between when Hupp arrived, and when Cook grabbed her). The jury acquitted Hupp.

4

According to Smithers, West Virginia State Police (WVSP) troopers can nudge prosecutors in the direction of prosecuting. Smithers Dep. Tr. (Doc. No. 82-1) at 69. Cook won't produce his conversations with the prosecutor.

Legal Implication: An officer is liable for malicious prosecution if he lies, hides evidence, or otherwise improperly influences the prosecution. Cook did all three.

Conclusion: The defense Motion must be denied as to malicious prosecution, Count IV.

4. UNLAWFUL POLICIES, PRACTICES, CUSTOMS, HIRING, TRAINING, AND SUPERVISION

Facts: Prior to joining the WVSP, Cook shot a mortally-wounded dog who could not use his back legs, and whom Cook, nonetheless, describes as a threat. Cook Dep. Tr. (Doc. No. 90-7) at 59–61. Nonetheless, the WVSP hired Cook and put him in an accelerated training so he could become an officer faster. *Id.* at 6. Smithers admits that his officers regularly interact with dogs. Smithers Dep. Tr. at 16–17, 65–66. Despite this, he did not implement additional training regarding dogs. *Id.* at 72. It is not surprising there is no extra training. To this day Smithers believes that Cook behaved perfectly, and there is nothing he would change. *Id.* at 23. It was Smithers who openly admitted that troopers nudge prosecutors to prosecute cases. *Id.* at 69.

Legal Implication: Smithers, despite being in charge of training, viewed training about how to handle dogs as a low priority. He omitted critical training as a result. And he ratified Cook's behavior. Indeed, under Smithers's rules, Cook's behavior didn't even require a "use of force" report, despite the fact he pulled his gun, threw Hupp to the ground, and arrested her.

Conclusion: The defense Motion must be denied as to unlawful policies, practices, customs, hiring, training, and supervision, Count V.

## II.    Detailed Statement of Facts

The Defendants' Memorandum (Doc. No. 93) in support of their Motion for Summary Judgment gets almost every important fact wrong. The plaintiffs addressed some of these facts in the Plaintiffs' Memorandum in support of their own Motion for Summary Judgment. The plaintiffs incorporate herein the facts described in the Plaintiffs' Memorandum. Additional facts responsive to the defendants' tale are included below.

### A.    *Cook Points his Gun at a Leashed, Tail-Wagging, Ten-Year-Old Dog*

The defendants assert that Cook was "surprised" by Buddy. Defs.' Mem. at 15. They assert Buddy was not the "happy-go-lucky lap dog" that the plaintiffs "make him out to be." *Id.* at 6. But the undisputed evidence runs the other way. At trial, Cook admitted that he first saw Buddy "out across the road" from him. Trial Tr. (Docs. Nos. 90-1–3) at 48. Thus, Cook saw Buddy before entering the Myers's yard. Indeed, the Video shows Buddy was standing next to the SUV in plain sight before Cook entered the yard. Video of Incident at 0:43; Response Ex. D, Still of Buddy before Approach (taken from Video at 0:43:400). Yet, Cook now says he did not see Buddy before he entered the yard. Cook Dep. Tr. at 27. Cook says this despite his alleged 'situational awareness' as an officer and "heightened sense of awareness" in this particular situation. *Id.* at 25, 29; Trial Tr. at 48; *see also* Cook Dep. Tr. at 123–24. The defense would have the Court believe that Cook was on alert because he thought Buddy was dangerous. Cook testified that he was "warned" and "had prior knowledge" about Buddy, and had heard an allegation that Buddy was a "vicious," "aggressive dog" at the Myers home. Trial Tr. at 48, 50, 72; Cook Dep. Tr. at 26, 160. Cook states, however, that he didn't look for Buddy before stepping into the yard. Cook Dep. Tr. at 27–28. He states that, prior to approaching Buddy,

Cook neither checked to see if he was on a chain, asked if he was on a chain, nor asked anyone to secure him. Trial Tr. at 68–69.

While the defense now asserts that Cook was "surprised" by Buddy, Defs.' Mem. at 15, in the criminal trial, Cook testified that he chose to approach Buddy: "I went towards the dog intentionally to do the assessment to make sure what the situation was to determine if it was a threat or was not a threat." Trial Tr. at 72. Cook was unequivocal that he saw Buddy and chose to approach him: "I was walking up towards the front of the house. I see a dog. I had prior knowledge. I went over to him like, 'Hey, come here.'" *Id.* at 72. He also admitted that Buddy was chained on a tether. *Id.* at 51.

Thus, the new position that Buddy rushed Cook, surprising him, is contradicted by Cook's own sworn testimony. Regardless, if Cook was surprised to see Buddy, it was Cook's own fault. The defense expert concedes that he would advise officers that, once alerted to an allegedly dangerous dog, they should visually scan for that dog before entering his home property. Faulkner Dep. Tr. at 58. He admits that it would be routine for officers to determine whether there is a potentially-dangerous animal in a house or fenced yard before entering. *Id.* at 87–88. He admits that, if he saw a dog at the entrance to a home, he would ask the owners if the dog was friendly or could be put away. *Id.* at 87–88. Cook did none of this. *See, e.g.,* Trial Tr. at 68–69. The defense expert also admits that it would be "unreasonable" for an officer to approach a dog whom he had been told was aggressive. *Id.* at 62.

After Cook approached Buddy, he drew his gun, pointing it at Buddy's head. *See* Video of Incident at 1:21–27; *see also* Tiffanie Hupp Dep. Tr. at 53. The gun has no safety. Cook Dep. Tr. at 55. Cook was "prepared to shoot." Trial Tr. at 78 ("Yes, I was going to shoot the dog.").

Cook tried to explain this behavior by testifying that Buddy was "snapping" his "jaws," "biting," making "his teeth clack," "snarling," "show[ing his] teeth," "lunging," "growling," and behaving "aggressively." Trial Tr. at 48, 50–51, 72; Crim. Compl. at 2–3; Cook Dep. Tr. at 13, 17, 18, 53. The Video shows none of this. It shows a calm dog wagging his tail, looking around. *See* Video of Incident at 1:25–1:30. At trial, Cook went so far as to claim that Buddy "was still snapping at" and "coming at" him, even after Cook pulled his gun on Buddy. Trial Tr. at 51. Fortunately, the Video captures the moment in time after Cook pulled his gun on Buddy. It shows Buddy was neither "snapping" nor "coming at" Cook. Video of Incident at 1:25–27. In the Criminal Complaint, Cook went even farther—claiming Buddy was "still . . . growling and approaching" even after Hupp arrived next to Cook and Buddy. Crim. Compl. at 2. The Video, however, shows that, when Hupp arrived, Buddy continued to wag his tail and moved away. Video of Incident at 1:27–31. Even when the Video does not capture Buddy's behavior, circumstantial evidence shows Buddy was behaving calmly. Dog Expert James Crosby explains that, "[t]ypically it takes quite a bit of time for an aggressive dog to calm down . . . An aggressive dog, a defensive dog, a fearful dog doesn't just turn that off. It takes quite a bit of time for them to readjust their behaviors." Crosby Dep. Tr. at 93. If Buddy were behaving as Cook describes just before appearing on Video, the Court could expect him to continue showing at least some of that behavior on camera. Second, Crosby conducted his own evaluation of Buddy, and observed his reaction to a stranger entering his property. *See* Crosby Expert Rep. (Doc. No. 90-18) at 2, 10; *see also* Response Ex. E, Video of Evaluation. He concluded that,

> Buddy exhibits behaviors consistent with a friendly, well-socialized and human friendly family dog. Specifically, Buddy approached me, a complete stranger, with proper affiliative behavior. He allowed extensive physical handling and

8

manipulation. Buddy did not react with territorial aggression when I first entered the property, nor did he act with any aggressive display, offensive or defensive, during my evaluation and assessment, or when I loudly confronted Mr. Myers on the property.

Regarding the perception of Buddy by Trooper Cook as an aggressive or threatening dog, I find that Trooper Cook did not properly assess Buddy's behavior. . . Trooper Cook overreacted and failed to correctly assess the situation. A well-trained officer, or indeed a reasonable officer, would not have perceived Buddy as a credible, serious threat.

Crosby Expert Rep. at 15 ¶¶ 1–2.

The video reveals Buddy was wagging his tail, looking around, and displaying traits that Tpr. Cook was trained to view as "playful" or "relaxed." *See* Cook Supp. Responses 3d Set Reqs. for Prod. (Doc. No. 90-17) at 6 (listing "[t]ail down and relaxed" as a sign of a "[r]elaxed" dog and stating that a "[t]ail may broadly wave" when a dog experiences "[p]layfulness"). The defense position that it is "reasonable" to point a gun at a dog wagging his tail, Defs.' Mem. at 6, finds no support in the record. Instead, the evidence suggests Cook is unreasonably prone to shooting dogs. Cook admitted at his deposition that in the past, he shot a paralyzed dog, testifying simultaneously that the dog was so injured he needed to be euthanized, and also that he also remained a threat, necessitating deadly force, though the dog had already been shot in the spine, couldn't use his back lags, and was "mortally wounded." Cook Dep. Tr. at 59–61.

The witnesses who know Buddy, and a dog expert who met Buddy for the first time, disagree with Cook's description of Buddy as aggressive. Clifford Myers Dep. Tr. at 22; Tiffanie Hupp Dep. Tr. at 29; Dalton Myers Dep. Tr. at 11; Ryan Hupp Dep. Tr. (90-14) at *52, 55*; Lindsey Myers Dep. Tr. (Doc. No. 90-15) at 7, 28–29; Crosby Expert Rep. at 11, 14–15. Buddy sleeps inside with his human family at night. Clifford Myers Dep. Tr. at 29–30. As of May 2015,

he usually spent his time with Tiffanie Hupp and her small child, Riley. Tiffanie Hupp Dep. Tr.

at 47. Ryan Hupp described him as "a coward," and stated that he "obviously" "wouldn't bite"

Cook. Ryan Hupp Dep. Tr. at 52. Buddy was about ten years old at the time of the incident. *See*

Clifford Myers Dep. Tr. at 19.

In addition to treating a friendly, chained dog, as a threat, there are other problems with

Cook's behavior. First, he carried a baton and pepper, or oleoresin capsicum (OC), spray. Cook

Dep. Tr. at 17, 57–58. Both are effective dogs, and non-lethal:

> The use of oleoresin capsicum spray is recognized by authorities, including the
> United States Department of Justice and the National Animal Control Association,
> as highly to nearly certainly effective stopping the approach of an aggressive dog.
>
> Had Cook deployed his baton in a protective manner, and had Buddy been a truly
> aggressive/territorially protective dog, Cook would have almost certainly been able
> to redirect Buddy by deploying his baton and using his baton end as a diversion
> target. This process is well known and recognized by professionals as a valid and
> effective manner of diverting a dog from direct engagement with an Officer.

Crosby Expert Rep. at 17–18 ¶¶ 7, 10. Yet Cook chose his gun.

Cook's training also makes it undisputed that he acted unreasonably. In the last week of

February 2015, just two months before he pulled a gun on Buddy, Cook received training about

how to tell friendly dogs from dangerous dogs. Cook Supp. Responses 3d Set Reqs. for Prod. at

3, 5–6. This was essential because, as Col. Smithers and Captain White testified, interacting with

dogs is a routine part a WVSP trooper's job. Smithers Dep. Tr. at 16–17, 65–66; Response Ex. F,

White Dep. Tr. at 31–33. Cook says he perceived Buddy's tail wagging as "aggressive." Cook

Dep. Tr. at 12–13. A comparison of the Video of Incident this with the images used to train

Cook show the opposite. *See* Cook Supp. Responses 3d Set Reqs. for Prod. at 6. Buddy is

somewhere between the top left picture in those training materials, titled "[r]elaxed" and the top

10

right, titled "[p]layfulness." The chart below repeats the traits that Cook's training lists as signs of

being "relaxed" or "playful[ ]" and notes whether Buddy displayed them. *See* Cook Supp.

Responses 3d Set Reqs. for Prod. at 6 (containing descriptions quoted below).

| Description in Training | Does Buddy Display Trait in Video? |
|---|---|
| **"Relaxed" Traits** | |
| "Ears Up (not forward)" | Yes |
| "Head high" | Yes |
| "Loose stance. Weight flat on feet" | Yes |
| "Tail down and relaxed" | Sometimes—waves |
| "Mouth open slightly, tongue exposed" | Yes |
| **"Playfulness" Traits** | |
| "Tail up" | Sometimes—waves |
| "Tail may broadly wave" | Yes |
| "Ears up" | Yes |
| "Pupils dilated" | Unknown |
| "Mouth open, tongue may be exposed" | Yes |
| "Front end lowered by bent forepaws" | No |
| Note: "may be accompanied by excited barking" | Yes |

The next chart addresses the traits that the materials say could indicate aggression.

| Description in Training | Does Buddy Display Trait in Video? |
|---|---|
| **"Dominance/Aggression (Offensive threat) traits** | |
| "Tail raised and bristled" | No |
| "Hackles raised" | No |
| "Forehead may show vertical wrinkles" | No |
| "Ears forward (may spread slightly to the side to form a wide V shape)" | No |
| "Nose wrinkled" | No |
| "Lips curled" | No |
| "Teeth (and often the gums) are visible" | No |
| Tail is stiff but may be seen to quiver or vibrate" | No |
| "Stiff-legged stance, body leaning slightly forward" | No |
| "Mouth open and C-shaped, Corner of mouth is forward" | No |
| **"Fear/Aggression (Defensive threat)"** | |
| "Hackles raised" | No |
| "Ears back" | No |
| "Body lowered" | No |
| "Pupils dilated" | unknown |

| "Tail tucked (little or no movement)" | No |
| "Nose wrinkled" | No |
| "Lips slightly curled (teeth may be somewhat visible)" | No |
| "Corner of mouth pulled back" | No |

Beyond Buddy's body language, there are other facts Cook must confront. In his deposition, Cook admitted that Buddy was *not* advancing, saying he and Buddy were in what he calls a "Mexican standoff." Cook Dep. Tr. at 35. He also admitted that he knew Buddy was on a leash *before* he threw Hupp to the ground. *Id.* at 132 ("I knew when I turned my back to the dog that it was on a tether."). The defense expert goes even further, admitting Cook knew that Buddy was on a lead before Hupp even came down the hill. Faulkner Expert Rep. at 13 ¶ 5; Faulkner Dep. Tr. at 130–31. Thus, even if Cook initially perceived Buddy as a threat, he did not holster his gun when the perceived threat was gone. That is unreasonable.

### B. Cook Ordered People to Control Buddy, Then Grabbed Hupp, Threw Her, and Arrested Her for Obeying

Cook admits he asked for someone to control the dog. Trial Tr. at 52. Hupp came down the hill to do just that, asking Cook not to shoot Buddy. She did not run. She walked. Video of Incident at 1:26–28. She is not heard yelling. *Id.* at 1:26–28. Her arms are by her side. *Id.* at 1:26–28. She stands at a 90-degree angle beside Cook. *Id.* at 1:28. Hupp was trying to keep Buddy from being shot by responding to Cook's request to control the dog. But rather than thanking Hupp and putting the gun away so she could grab Buddy, Cook grabbed Hupp. *Id.* at 1:28–30; *see also* Tiffanie Hupp Dep. Tr. at 52 ("I didn't even get a chance to get the dog.").

Cook has testified that he gave Hupp two separate commands to step back. Trial Tr. at 52; Cook Dep. Tr. at 39. The defense expert claims he gave *three*. Faulkner Dep. Tr. at 120. The timing of the Video shows, however, that Cook likely didn't give any 'step back' command at all,

and certainly didn't give Hupp time to comply. Hupp arrives at 1:27 in the Video of Incident. She is grabbed at 1:29. She is thrown to the ground by 1:31. Tellingly, Buddy, the allegedly 'aggressive' dog, ran away once he saw Cook grab Hupp. 1:30–31.

### B.  Cook, Caught on Video, Enters Home without Warrant, Exigency, or Consent

Cook learned that his actions had been caught on video. While Tiffanie Hupp was pressed up against a police car, in handcuffs, she cried for someone to help. Video of Incident at 2:23–24. According to Cook, her husband responded, "Don't worry babe. I've got that shit." Cook Dep. Tr. at 71. Cook admits he knew this referred to the Video. *Id.* at 71–72. He also admits he knew Ryan Hupp was glad to have it. *Id.* at 71.

After learning there was a tape showing Cook's actions, he entered the home. Cook Dep. Tr. at 72–73. He had neither consent nor a warrant to enter. *See* Crim. Compl. (lacking mention of either). He ordered Clifford Myer's pregnant daughter to come out of a room, or else he would take her to jail. Dalton Myers Dep. Tr. at 38; Ryan Hupp Dep. Tr. at 48; Lindsey Myers Dep. Tr. at 73. Then he took every electronic device he could find, seizing three phones and even little Riley's play tablet. Clifford Myers Dep. Tr. at 79–80. No one consented to the seizure. Cook Dep. Tr. at 72–73. He had no search warrant. *See* Crim. Compl.

There was no danger in the home either, and thus no exigency. The defendants' own experts concedes this. Faulkner Dep. Tr. at 64–65. To the contrary, Cook knew Ryan Hupp was glad to have the Video. Cook Dep. Tr. at 71. Based on his testimony, Cook apparently doesn't believe he needs exigency, a warrant, or consent to seize evidence. *Id.* at 65, 69, 72.

### C.  Cook Lies in Sworn Documents and at Trial

Cook altered the story of what happened, bending it into a tale of a hyper-aggressive dog

and a dangerous woman who was a risk to grab his gun. The chart below lists examples of

Cook's false statements in the Criminal Complaint, which conflict with the Video evidence.

| Cook's Statements in Criminal Complaint | What Video of Incident Shows |
|---|---|
| "[Cook] drew [his] sidearm [ ] and presented it to the dog that was still rapidly approaching and snarling." | False. Buddy neither approaches when gun is out, nor snarls. Video of Incident at 1:25–27. |
| "[Cook] immediately lowered the firearm and ordered [Hupp] to step aside." | False. Firearm remained pointed at Buddy. There was no time for an order to be given before Cook grabbed Hupp. Video of Incident at 1:27–29. |
| "[Cook was] still seeing the canine growling and approaching." | False. Buddy was wagging his tail and not advancing. Video of Incident at 1:25–30; *see also* Cook Dep. Tr. at 35 (admitting Buddy not advancing). |
| "[Hupp] refused to comply and raised her hands towards [Cook]." | False. Cook grabbed Hupp while her arms were by her side, and before she would have had time to comply with any alleged order. Video of Incident at 1:28. |
| "The defendant then grabbed at [Cook] and began cursing [him]." | False. Hupp did not grab Cook. Video of Incident at 1:27–32; *see also* Tiffanie Hupp Dep. Tr. at 63–64, 96. Cook now says Hupp "grabbed" him during the brief instant when his back was to the camera, conveniently hiding it. Cook Dep. Tr. at 46–47. Even the defense expert doesn't seem to buy it—He says, instead, that Hupp might have "push[ed]" Cook (again, in the split second no one can see). *See* Faulkner Dep. Tr. at 127. However, Hupp did not push Cook, either. Tiffanie Hupp Dep. Tr. at 52. |

Cook repeated the above statements to obtain a search warrant. Search Warrant. This

time, however, Cook implied that Hupp had grabbed him *twice*. *See id.* at 5 ("The defendant

then again grabbed at your affiant."). Cook's narrative attached to the Complaint Report is also

virtually identical. Response Ex. G, Compl. Rep. He told similar lies at trial.

| Cook's Trial Testimony | What Video of Incident Shows |
|---|---|
| "Once the dog came at me, that's when I drew my pistol.   It was still snapping at me, coming at me." Trial Tr. at 51. | False. Buddy never snapped, and was not "coming at" Cook, at least once he drew gun. Video of Incident at 1:25–31; *see also* Crosby Dep. Tr. at 93 (cannot "just turn that off"). |
| "I drew my attention to Ms. Hupp and I told | False. There was no time to give such an |

| | |
|---|---|
| her she needed to step back, and she refused at that point." Trial Tr. at 52. | order, and certainly no time for Hupp to have "refused." Video of Incident at 1:28–29. |
| "I told Ms. Hupp to step back. She made some comment as to I couldn't tell her what to do on her property. And I said, 'Ma'am you need to step,' and I went towards her, grabbed her." | False. There was no time for such a conversation to occur between the time Hupp arrived and the time Cook grabbed her. Video of Incident at 1:28–29. |
| "At that point, whenever I got a hold of Ms. Hupp, she began cursing and using profanities, grabbing my uniform, at which time I just–I still had my handgun out and due to that is not a safe situation to be in, so I just basically stiff armed her out just so I could holster, and in doing so we spun. She fell down the hill. I holstered up and then I went to make the arrest." | False. The Video shows that Hupp did not grab Cook. Video of Incident at 1:29–31; *see also* Tiffanie Hupp Dep. Tr. at 63–64. While Cook's trial testimony was that Hupp grabbed him *before* they spun, Cook now says Hupp grabbed him *after* they spun, when his back was turned to the camera. Cook Dep. Tr. at 46–47. |

### D. *Cook Influenced the Prosecutor, and this is not Unusual for WVSP*

Cook communicated with the prosecutor before the case went to trial. *See* Cook

Responses to First Set Req. Prod. (Doc. No. 41-2), Req. 5. The defendants are unwilling to allow

the plaintiffs to read those notes. The plaintiffs have asked this Court to compel production. *See*

Mot. to Compel (Doc. No. 41). If Cook had told the prosecutor he knew Buddy was not a threat

while he continued to point his gun at Buddy, and that he grabbed Hupp before she had any

chance to respond to any alleged 'step back' order, no reasonable prosecutor would have

proceeded. It would clearly not meet the elements of obstruction. The only reasonable inference

is Cook told the prosecutor the same story he told on the stand—one of a dangerous, charging

dog who kept biting at him, while an aggressive woman tried to grab him or his gun.

Former Colonel of WVSP, Defendant Col. Smithers, explained that, if an officer is

"involved in litigation that's going to court, then the officer is going to be working elbow-to-elbow

with [ ] the prosecutor." Smithers Dep. Tr. at 67. The officers end up having close relationships

with the prosecutors, and a role in helping the prosecutor decide when to prosecute. *Id.* at 67–68. They can nudge prosecutors in the direction of prosecuting. *Id.* at 69.

III.   Discussion

A.   *Qualified Immunity*

A government official is not entitled to qualified immunity if, construing the facts in the light most favorable to the plaintiff, his actions violated a constitutional right and that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 231-36 (2009). The Fourth Circuit has "repeatedly . . . held that it is not required that a right violated already have been recognized by a court in a specific context before such right may be held 'clearly established' for purposes of qualified immunity." *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 734 (4th Cir. 2013) (citing *Buonocore v. Harris*, 65 F.3d 347, 356–57 (4th Cir. 1995)).

This means the defendants' Motion is unwarranted and unrealistic. The plaintiffs have developed a careful evidentiary record, including two experts, several witnesses, Videos, and multiple sets of discovery answers. The plaintiffs' evidence shows an officer who lost control, covered up his misbehavior, and lied about it. And it proves that the WVSP colonel approves. Those acts are entirely out of bounds, unprotected from any qualified immunity.

B.   *Hupp's Arrest for Obstruction was Unreasonable.*

"Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001). Based on the conduct known to the officer (and visible) in the Video, there is no way a reasonable officer could construe the West Virginia offense of obstruction as applicable to

16

Hupp's actions. Hupp testified that she responded to Cook's command to control the dog.[1] Tiffanie Hupp Dep. Tr. at 49–51. Even Cook's partner recognized that Hupp's actions in walking down to the dog could be understood as complying. Michael Dep. Tr. at 33. Video evidence shows that Hupp approached the dog and the trooper with her arms at her side, at walking pace. Video of Incident at 1:27–28. Hupp is *not* heard yelling as she approaches. *Id.* at 1:27–28.[2] She also testifies that she never swore at Cook. Tiffanie Hupp Dep. Tr. at 51. Within two seconds after Hupp first responded to the command to help with the dog, Cook grabbed her. Video of Incident at 1:27–29. He threw her to the ground and arrested her. *Id.* at 1:29–43. The fact that so little time passed between when Hupp arrived near Cook and when Cook grabbed her precludes the conclusion that she was obstructing. The evidence suggests that Cook had no time to give an order before he grabbed her. Even if Cook gave a command while grabbing Hupp, she was not given time to respond. No reasonable officer could believe that obstruction occurs in two seconds or less, when the person is not yelling, much less physically obstructing.[3]

The use of the West Virginia obstruction statue here was an abuse of power. This was not

---

[1] The defendants try to argue that Cook was only asking Myers to control his dog, and not requesting Hupp to help. Defs.' Mem. at 7, 20. But this characterization is at odds with the factual record–including Cook's testimony. Cook testified at trial that he asked "them" to control Buddy, and lamented that "no one" did so, thus making clear that Cook's instructions to control Buddy were issued to the whole family. Trial Tr. at 52.

[2] Notably, when Hupp does yell (once arrested), it is audible on the Video. Video of Incident at 2:23–25. Thus, Cook's disputed testimony that Hupp was yelling profanities at him is belied by the evidence. Cook Dep. Tr. at 23, 33.

[3] By the time Cook grabbed Hupp, he saw that the dog was chained. Cook Dep. Tr. at 132. At the point when Cook threw Hupp to the ground, he thus knew that Hupp was not obstructing him from doing anything lawful, because the dog did not present a threat.

reasonable mistake, but rather, an angry outburst by an officer tired of what he perceived as the public's "lack of respect for authority." Cook Dep. Tr. at 123. Hupp acted kindly and lawfully in trying to save the family pet. Indeed, Cook was "prepared to shoot" and "going to shoot" Buddy. Trial Tr. at 78. Hupp saved Buddy's life.

Finally, even if Cook were right that Hupp was being disagreeable, Fourth Circuit law forbids such a capacious use of the obstruction statute. *Wilson v. Kittoe*, 337 F.3d 392, 399 (4th Cir. 2003) (denying qualified immunity when officer arrested for obstruction based on verbal criticism, invocations of constitutional principles, and refusal to leave when commanded); *Lowe v. Spears*, 258 F. App'x 568, 570 (4th Cir. 2007) ("Arresting a person solely based on speech that questions or opposes police action violates the First Amendment"); *see also State v. Jarvis*, 172 W. Va. 706 (1983) ("[A] person does not unlawfully hinder an officer by simply questioning [the arresting officer]."); *Rogers*, 249 F.3d at 279 (finding behavior did not obstruct where homeowner was "stepping in front of" officer and "getting in his face"). Cook has admitted that he frequently arrests citizens for obstruction. Cook Dep. Tr. at 109. This case illustrates the need to reinforce the clearly established prohibition against the abuse of this statute.

### C.    *Throwing Hupp to the Ground Violated Established Law.*

Because the arrest was patently unreasonable, the use of any force, much less throwing Hupp to the ground, suffices to state a claim for excessive force under clearly established law. Where the person "committed no crime," by alleging force on the part of the officer, "the plaintiff had stated a claim for violation of his constitutional right to be free from excessive force." *Bailey v. Kennedy*, 349 F.3d 731, 743 (4th Cir. 2003); *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (recognizing de minimus force as excessive when arrest unlawful).

18

### A. Defendants' Effort to Divorce Force from Context Defies Fourth Circuit Precedent

Even if the arrest had been lawful, the defense's argument that throwing Hupp to the ground was reasonable is undermined by clearly established law. The defense deploys a compartmentalized view of the facts in an effort to obscure the big picture. The defense would have this Court look only at the moment when Cook grabbed Hupp by the arm and threw her to the ground, arguing she resisted when he grabbed her. This compartmentalized approach to reviewing an excessive force claim has been explicitly rejected by a leading Fourth Circuit case, which criticized an officer's "segmented view of the sequence of events" that placed all of the emphasis on the victim's "resistance" during the two-way struggle with the officer. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The effort to separate out a few potentially favorable facts for the officer "from the rest of the story" was, according to the Circuit, erroneous because it allows one to excuse contextually unreasonable acts of force by missing the "the forest for the trees." *Id.* "The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Id.* Here, the context is critical: If Cook had not unholstered and side-grip pointed his pistol at a peaceful dog's head, none of the other events would have transpired. Because Circuit law does not allow "artificial divisions in the sequence of events," even when those events include forceful resistance by the person confronted by the officer, as alleged in *Rowland,* the defense is not entitled to judgment. *Id.* at 173. Viewed in context, a woman was thrown to the ground and arrested because she tried to shield the family pet from being shot. The analogy to *Rowland*, which also involved a trivial crime, is illustrative of how the *Graham* factors for excessive force apply here:

When all the factors are considered *in toto,* it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill. There is no dispute here that the offense was a minor one, not as serious as pickpocketing or purse-snatching. . . . Second, Rowland posed no threat to the officer or anyone else. There never has been any suggestion that Rowland was armed or that Perry suspected he might be. Nor is there any real evidence that this relatively passive, retarded man was a danger to the larger, trained police officer. Finally, while there is some evidence that *Rowland offered [physical] resistance,* . . . [such disputed] facts alone are not enough to warrant denial of summary judgment in this context. Combined with such unfavorable *Graham* factors, . . . we believe that a jury could find that no reasonable officer could have believed his conduct to be lawful in light of the circumstances known to him at the time.

*Rowland*, 41 F.3d at 174 (emphasis added) (citation omitted).[4]

This same analysis forecloses the defense's argument that the excessiveness of Cook's force should be measured by the fact that initially he only grabbed Hupp's arm, and only after she flinched, did he throw her to the ground. As the Fourth Circuit has held in applying the *Rowland* decision, a victim's "initial act of pulling her arm away" does not justify an officer's "decision to throw her down," because this is precisely the sort of "segmented approach" that is not permissible. *Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015). As here, the arrested person "had been fully compliant and responsive up to the point that [the officer] tried to grab her without warning or explanation," and it is clearly established that her reaction to such a grabbing would not justify additional force such as being thrown. *Id.*

### B.  Applying the Excessive Force Factors

Beyond the guidance in *Rowland,* force determinations require careful attention to "three

---

[4] *See also Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015) (citing and quoting *Young v. Los Angeles,* 655 F.3d 1156, 1165 n. 8 (9th Cir. 2011) ("While the fact that Young was suspected only of misdemeanor offenses weighs against a finding that the use of significant force against him was justified, it is ultimately the nonviolent and relatively minor nature of his suspected offenses that is of more importance.").

factors in particular: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Smith*, 781 F.3d at 101 (quoting *Graham*, 490 U.S. at 396)). All three factors favor summary judgment for the plaintiffs, not the reverse.

Here, regarding the severity of the offense, Hupp was being arrested for allegedly interfering with Cook's ability to point his gun at Buddy, which is not a crime at all. Even the alleged crime was very minor– misdemeanor obstruction.

Hupp posed no threat to Cook's safety. The Video shows a tiny, unarmed woman, tossed to the ground by a large, armed officer. Under the Fourth Amendment, "in some circumstances *no use of force* is permitted because none is required." *Smith*, 781 F.3d at 102 (noting that second *Graham* factor, threat to the officer, weighs strongly against officer where officer "is a pretty good size man," while victim "is a smaller woman."). This was one of those times.

Regarding Hupp's compliance, the most Cook can muster is that she verbally resisted (and even this is disputed). That can't make the force reasonable. Cook is forced to concede that Hupp had her arms by her side and that he initiated contact. Cook can't blame Hupp for allegedly "resisting" by flinching grabbed.[5]

---

[5] The defense mocks force used in throwing Hupp to the ground, concluding cavalierly that it is impossible to "to imagine him using *any* less force." Defs.' Mem. at 17. For a reasonable officer, it would not take much imagination: Cook could have holstered the gun and apologized for pulling it out on the family's friendly, chained pet. If he had a fear of dogs, he could have allowed Hupp to take the dog away. The defense also belittles Hupps' injuries. But their position defies the record and the law. First, whether injuries are *de minimus* or not is legally irrelevant. *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010). Second, Hupp went to the hospital, was diagnosed with injury, and was prescribed medication. Camden Clark Medical Docs. at 4, 26–27, 34, 52.

D.    *Malicious Prosecution*

Hupp's prosecution was illegal. In West Virginia, to win a malicious prosecution claim, a plaintiff must prove "(1) that the prosecution was malicious, (2) that it was without reasonable or probable cause and (3) that it terminated favorably to plaintiff." *Baldau v. Jonkers*, 229 W. Va. 1, 9, 725 S.E.2d 170, 178 (2011). Malice may be inferred from the prosecution of a civil suit, action or proceeding, or a criminal charge, where want of probable cause for such prosecution is shown by a preponderance of the evidence. *Truman v. Fid. & Cas. Co. of N. Y.*, 146 W. Va. 707, 721–22 (1961). Under Fourth Circuit law, an officer may be liable for malicious prosecution if he:

1.  "[l]ied to or misled the prosecutor," *Evans v. Chalmers*, 703 F.3d 636, 647–48 (4th Cir. 2012), citing *Sykes v. Anderson,* 625 F.3d 294, 317 (6th Cir. 2010); *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir. 1988); *Borunda v. Richmond,* 885 F.2d 1384, 1390 (9th Cir. 1988),

2.  "[f]ailed to disclose exculpatory evidence to the prosecutor." *Chalmers*, 703 F.3d at 647–48 (4th Cir. 2012), citing *Dominguez v. Hendley,* 545 F.3d 585, 590 (7th Cir. 2008); *Sanders v. English,* 950 F.2d 1152, 1159–60 (5th Cir. 1992), or

3.  [u]nduly pressured the prosecutor to seek the indictment. *Chalmers*, 703 F.3d at 647–48 (4th Cir. 2012).

Here, Hupp won the criminal case against her.

The defense argues that the prosecutor said there was probable cause. But this Court doesn't defer to magistrates or prosecutors when probable cause is a rubber stamp. *See e.g., Robinson v. S.W. Miller*, No. 2:14-CV-00330, 2015 WL 5298965, at *23 (S.D.W. Va. Sept. 10, 2015) (rejecting finding of probable cause by a magistrate) *vacated in part on other grounds*, 662 F. App'x 216 (4th Cir. 2016). Nor should it, as there is overwhelming consensus in federal and in Virginia law that probable cause is rebutted by a showing "the indictment was procured by fraud, perjury, or falsified evidence." *Jarvis v. W. Virginia State Police*, 227 W. Va. 472, 480

22

(2010) (finding that even a grand jury finding of probable cause is not conclusive and relying upon decisions by multiple federal courts in diverse circuits). As result, if Cook acted improperly in his dealings with the prosecutor, he is liable for malicious prosecution.

Cook "lied to or misled the prosecutor." *Evans,* 703 F.3d at 647–48. Specifically, in the Criminal Complaint, he stated facts that Video evidence made clear were untrue. *See* "Cook Lies in Sworn Documents and at Trial," section II(E), *supra.*

### 5. FAILING TO DISCLOSE EXCULPATORY EVIDENCE TO A PROSECUTOR

Cook "also failed to disclose exculpatory evidence" to the prosecutor. For example, he never told the prosecutor that he approached Buddy or that Buddy was wagging his tail. More importantly, he never mentioned in his criminal complaint that:

1. He instructed those around him to control your Buddy, and that it was only after this, in response to a order, that Hupp came down the hill to talk with Cook.

2. Hupp asked him not to shoot Buddy.

3. He knew before Hupp came down the hill that he "realized Buddy was not on a chain and could not complete his attack." Faulkner Expert Rep. at 12 ¶5.

4. He did not give Hupp any chance to "step back."

### 6. IMPROPERLY INFLUENCING A PROSECUTOR

Finally, there is circumstantial evidence that Cook "unduly influenced the prosecutor." Col. Smithers, also a defendant, readily agreed that WVSP officers nudge prosecutors as to whether to prosecute. Smithers Dep. Tr. at 69.

### 7. MALICE

From these facts, the Court can infer malice. It may also find malice in the fact that Cook was upset that the video of his behavior was made public. Cook Dep. Tr. at 142–43. There is also good evidence Cook harassed Hupp and Myers before trial. He led an investigation of

alleged "child porn" against Myers and Hupp, which we now know was nonsense, as everyone has admitted that the only evidence of illicit material came from malware. *See* Cook Answers 2d Set Reqs. Admis. (Doc. No. 90-11), Reqs. 16, 35, 39; Response Ex. H, DeMeyer Dep. Tr. at 5, 14, 22–23, 26–29, 41, 46–47. A WVSP employee concedes that a Google search "immediately" revealed that the download was malware, *id.* at 47, but no such Google search was done until after Cook led an unnecessary search of Myers's home and Hupp's apartment. The search involved people in rubber gloves, multiple officers and squad cars. *Id.* at 40; Clifford Myers Dep. Tr. at 86. Rather than being glad to learn that no one was producing or viewing child pornography, Cook was disappointed, texting to an investigator that he was "bummed" he found nothing going on. All of this suggest that the prosecution was indeed, malicious.

8. COOK IS NOT PROTECTED BY QUALIFIED IMMUNITY FOR HIS MALICIOUS PROSECUTION.

The defendants' primary contention regarding malicious prosecution is that Hupp cannot prevail because the arrest, detention, release on bail and subsequent trial do not constitute a deprivation of liberty. Defs.' Mem. at 17–18. Defendants argues that because Hupp was fortunate enough to be acquitted, and prior to that released on bail, she cannot state a claim for malicious prosecution, arguing this not a "seizure." But both of these would be true in any malicious prosecution claim involving misdemeanors (and many felonies). As such, the defense's argument is a request for blanket immunity against all malicious prosecutions for misdemeanors (where release on bail is most likely). But this is not the rule. It is true that the Section 1983 cause of action for malicious prosecution is abstractly conceived of as a Fourth Amendment claim, requiring "seizure." But it is equally true a seizure, as relevant to a malicious prosecution claim,

24

occurred here. *Black v. Montgomery County*, 835 F.3d 358, 367-368 (3d Cir. 2016) (paying unsecured bond, travelling to the arraignment, being fingerprinted and photographed at police station, constituted a seizure even though accused was never actually incarcerated).

The defendants do not cite any Fourth Circuit law (or the law of any circuit) for their novel view, and the Fourth Circuit law most on point rebuts Defendant's narrow reading of "seizure." It suggests, instead, that any post bail restrictions, including the mere fact of having to post bail, may suffice. The Fourth Circuit has gone so far as to recognize that it is an open question as to whether a mere "summons [without arrest] constitutes a seizure for . . . Fourth Amendment purposes. *Burrell v. Virginia*, 395 F.3d 508, 514 (4th Cir. 2005). The Circuit also approvingly cited an out-of-Circuit case suggesting that an arrest, detention, restriction on travel or *any other deprivation of liberty* could constitute a seizure for these purposes. *Id.* at 516 (implying that mere issuance of summons suffices to state malicious prosecution claim, by holding there was probable cause, not an absence of a seizure).

This view of the law is consistent with Justice Ginsburg's crucial concurrence in the plurality decision, *Albright v. Oliver*, 510 U.S. 266, 277 (1994), which criticized any reading of the term "seizure" that would understand it as terminating for purposes of a malicious prosecution as soon as a defendant "was released from custody on bond." *Id.* The term *seizure* is sufficiently capacious as to include the hardships imposed on Hupp while released on bail and forced to stand trial on a fictitious charge. *Albright*, 510 U.S. at 279 (Ginsburg, J., concurring in plurality judgment) (rejecting notion that a "defendant released pretrial is not still 'seized' in the constitutionally relevant sense," because "such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed 'seized' for trial, so long as he is bound to

25

appear in court and answer the state's charges"). The plaintiffs anticipate the defendants' protestations that the Fourth Circuit has not yet recognized such a broad definition of seizure, but the ambiguity of the Supreme Court's holding coupled with the Fourth Circuit law most on point suggest otherwise. This, coupled with the compelling interest of holding officers responsible when they lie to procure prosecution of an individual, supports concluding a "seizure' occurred sufficient to support a malicious prosecution claim.

> E.     *No Reasonable Officer Could Conclude that Entry into a Home without Consent, Exigency or a Warrant is Permitted under Clearly Established Law*

The right to be free from warrantless searches and seizures is clearly established by numerous decisions of the Supreme Court and the Fourth Circuit Court of Appeals at every of abstraction, from the general to the particular. It is a "basic principle" of Fourth Amendment law that warrantless entry into the home and consequent seizure of property is per se unreasonable, subject to exceptions including exigent circumstances. *Payton v. New York,* 445 U.S. 573, 586 (1980). The Fourth Circuit has clearly established that the belief that immediate action is required to prevent imminent destruction of evidence "must be based on specific and articulable facts and reasonable inferences that could have been drawn from them." *United States v. Yengel*, 711 F.3d 392, 397 (4th Cir. 2013). The defense argues that Cook's entry was justified under the doctrine of exigent circumstances. Defs.' Mem. at 27–28. The argument for exigency is betrayed by Cook's own testimony. Indeed, during Cook's deposition he conceded that his view of the exigency exception is so capacious that he is allowed to seize evidence regardless of whether he believes that the evidence will not be destroyed. Cook Dep. Tr. at 65, 69, 72.

The evidence precludes summary judgment in favor of Cook. Ryan Hupp took the

Video to document police misconduct. Ryan Hupp Dep. Tr. at 49. When Cook was unlawfully arresting Hupp, after he had thrown her to the ground, Ryan Hupp yelled out to her a reassurance of accountability—something to the effect of, "Don't worry Babe. I've got that shit." Cook Dep. Tr. at 71. Only after hearing that there was a video of his violent arrest of Hupp did Cook decide to enter the home. *Id.* at 72–73; Ryan Hupp Dep. Tr. at 50. Cook testified that Ryan Hupp's assurance to Ms. Hupp that he got the incident on video indicated that he was happy to have the evidence. Cook Dep. Tr. at 71. It was indeed cause for celebration, because there can be very little doubt that without the Video, and with only Cook's testimony of what happened on the day of question, Hupp would have been wrongfully convicted. With facts that the plaintiffs and their family were pleased to have obtained a recording of the evidence so as to hold Cook accountable, a legal standard that requires them to show probable cause to believe that the evidence would be destroyed or otherwise made unavailable, Cook is beyond a doubt liable for an unlawful entry into Myers's home. Undeterred by the absence of facts (much less probable cause) to believe there was an exigency, Cook desperately latches on to two quotes from the family members present during the recording and heard *after the fact* of Cook's entry. Statements made or heard *after* Cook had already entered the home do not bear on whether Cook had exigency to enter the house *in the first place.* Justification for entry must be based on facts known to the officer at the time of entry. *Ornelas v. United States*, 517 U.S. 690, 701 (1996). On the defense's view of exigency, any home entry that turns up potential evidence that was not known prior to entry is justified. An officer who randomly busts down the door of an apartment only to see people running towards the back of the home and hiding from the police would have an exigency exception to the warrant. Any behavior deemed furtive *after* an illegal entry would

27

justify, post-hoc, an illegal entry based on the defense's view of exigency. And the discovery of any evidence that is "fragile" or "evanescent" instantly converts a warrantless entry into a valid exigency search, according to the defendants. Defs.' Mem. at 28. Such a view of the Fourth Amendment's protections is as dangerous as it is incorrect.

It was the Video recording that allowed Hupp to be acquitted at her criminal trial. It is also the Video that provides evidence for the plaintiffs in this civil case. Hupp was glad to have it, Cook knew it, and he so he illegally entered and seized it.

F.     No Reasonable Officer Could Conclude that Seizure of Several Devices without Consent, Warrant, or Exigency is Permitted under the Fourth Amendment.

Cook defends his seizure of the equipment used to record his unlawful arrest as an extension of his unfounded exigent circumstances theory. The exigent seizure piggybacks, according to Cook, on the exigent entry. There is nothing approaching an exigent circumstance justifying entry here. Moreover, the importance of granting summary judgment in favor of the plaintiffs, see Pls.' Mot. for Summ. J., or allowing this claim to proceed to trial, is illustrated by Cook's own assertions about his lawful authority. During his deposition, Cook freely acknowledged that he thinks there is exigency sufficient to seize any recording of him arresting a citizen. He testified that if a person films him conducting an arrest of, for example a DUI, and the person making the recording refuses to immediately consent to give Cook the recording devices, he would seize the items under the exigency exception. Cook Dep. Tr. at 68. Cook has exigency, under his logic, to enter any home or shop to seize security camera footage that happens to contain footage of him making an arrest. Cook's view of exigency is so broad as to swallow the protections of persons and effects under the Fourth Amendment, and it is on full

display here. *See id.* at 66 (treating non-consent itself as exigency.

G.    *Colonel Smithers*

The Fourth Circuit has reasoned that supervisory liability is premised upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984). The inquiry is whether the supervisor individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." *Moore v. Winebrenner*, 927 F.2d 1312, 1315 (4th Cir. 1991). A supervisor is liable for the "natural consequences of his actions" *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994) (finding citizen's death was the natural and foreseeable consequence of supervisor's failure to investigate, or even to address, the pervasive violent propensities of one of his officers).

It is clearly established that "a supervisor who [is] deliberately indifferent in the face of a pervasive and unreasonable risk of harm [can] be held liable under § 1983 where the inaction bore an affirmative causal link to the harm suffered by the plaintiff." *Id.* Deliberate indifference may be alleged in the form of a pattern of constitutional violations or by a supervisory power's failure to train its employees concerning an obvious constitutional duty that the particular employees are certain to face. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

Smithers had access to data regarding the frequency of WVSP dog shootings. He never requested it. Smithers watched how Cook behaved on video. He thinks it was flawless police work. Under Smithers's watch, what Cook did to Hupp did not even require a "use of force" report, making such behavior invisible. And Smithers admits that the WVSP regularly come into contact with dogs, but he thinks more training is not a high priority. Finally, Smithers suggests

29

that nudging' a prosecutor to prosecute is common practice. These facts make Smithers liable for his "failure to train . . . employees concerning . . . obvious constitutional dut[ies] that particular employees are certain to face." *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

### H.   Emotional Distress

It is for the trier of fact to determine, taking into account changing social conditions and the plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage." *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 428 (WV 1998). Given society's current sensitivity to excessive force by law enforcement, it is a genuine issue of material fact whether. Cook's conduct is sufficient to constitute extreme outrage. Additionally, West Virginia courts have held that force applied "maliciously and sadistically" might also be fairly characterized as "atrocious and intolerable." *Miller v. Rubenstein*, No. 2:16-CV-05637, 2018 WL 736044, at *17 (S.D.W. Va. Feb. 6, 2018).

### I.   State Battery

The claim for battery must be allowed to proceed to the jury because the plaintiffs have put forth evidence of excessive force. The Fourth Circuit has held that a claim for battery should proceed to trial when there is a viable excessive force claim under § 1983. *Barfield v. Kershaw Cty. Sheriff's Office*, 638 F. App'x 196, 201 (4th Cir. 2016); *Rowland*, 41 F.3d at 174.

## IV.   Conclusion

The plaintiffs urge this Court to deny Defendant's Motion for Summary Judgment.

/s/ Alene Anello
Alene Anello
Animal Legal Defense Fund
525 E. Cotati Ave.
Cotati, CA 9 94931
aanello@aldf.org

914-844-5447

and

John Campbell
Campbell Law LLC
20 S. Sarah St.
St. Louis, MO 63108
john@campbelllawllc.com
314-588-8101

and

David Schles
815 Quarrier St., Suite 306
Charleston, WV 25301
schles_law@wirefire.com
304-344-1559

and

Justin Marceau
2255 E. Evans Ave.
Denver, CO 80208
jmarceau@law.du.edu
303-871-6449


## CERTIFICATE OF SERVICE

I certify that a true and accurate copy was filed on March 27, 2018, via CM/ECF to be distributed to all counsel of record.


/s/ Alene Anello