UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

**TIFFANIE HUPP**, **R.H.**, *a minor, by and through his next friend, Tiffanie Hupp*, *and*
**CLIFFORD MYERS**,
    *Plaintiffs,*

*v.*

**STATE TROOPER SETH COOK** *and*
**COLONEL C.R. "JAY" SMITHERS**,
    *Defendants.*

**No. 2:17-CV-926**
**Hon. Thomas E. Johnston**

### DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As demonstrated below, Plaintiffs have not placed any material fact reasonably in dispute, and Defendants are entitled to judgment as a matter of law.

### I. ANALYSIS

Plaintiffs argue in their response that they have identified evidence that places into reasonable dispute whether someone who knew a lot more about Buddy than Trooper Cook did might have believed that Buddy was a harmless, aging lap dog. They argue that they have identified evidence that places into reasonable dispute whether someone could have thought that Buddy's certain death was imminent. That Trooper Cook asked "those present," "people," or "someone" to control Buddy.[1] That Tiffany Hupp was just trying to control Buddy.[2] That Ryan Hupp was going to helpfully turn over the video recording that he had made of Tiffany Hupp's conduct. That is, they argue that someone might have drawn different inferences from the facts confronting Trooper Cook than he did, and might have reacted differently than he did.

---

[1] (Pls.' Resp. at 2 (alleging that Cook "directed those present to control the dog"); *id.* at 12 ("Cook Ordered People to Control Buddy" and "Cook admits he asked for someone to control the dog.")

[2] (*Id.* at 17 ("Even Cook's partner recognized that Hupp's actions in walking down to the dog could be understood as complying.").)

7986259

Plaintiffs are—still—answering the wrong questions. The Fourth Amendment does not ask whether someone might have drawn different factual conclusions about the circumstances that confronted the defendant police officer than the defendant drew. Nor does it ask whether someone might have reacted differently to those circumstances than the defendant reacted. The Fourth Amendment asks only whether an objectively reasonable police officer, confronted with the totality of same circumstances confronting Trooper Cook, *could* have come to the same factual conclusions that Cook did and *could* have believed that Trooper Cook's reactions to those circumstances were reasonable. Plaintiffs do not even make an effort to address *those* questions, and they certainly have offered nothing relevant to suggest that the answer to either question is no.

A. **Plaintiffs are misusing the Video.**

Plaintiffs allege that they have reasonably disputed whether Trooper Cook lied about some of the things that he testified to because the Video did not capture them happening. For example, Plaintiffs allege that Trooper Cook's testimony that Buddy was "growling and approaching" "was a lie" because the Video does not show it.[3] Plaintiffs fail to mention that the Video started after or ended before all of the acts in question, or the acts were outside of the audio or video that the Video captured.

The Video did not capture Buddy growling or snapping, but it also does not prove that he was not, because the Video was recorded from inside the house with a loud video game being played in the background; it barely even captured Buddy when he was loudly barking.[4] Likewise, the fact that the Video did not capture Buddy approaching Trooper Cook does not prove that Buddy was not approaching Cook, because at the time, Buddy was outside the

---

[3] (*Id.* at 4.)
[4] (*See* Video.)

2

camera's field of view.[5] In both cases, this leaves Trooper Cook's undisputed testimony as the *sole evidence* of what happened. Plaintiffs have thus *not* put these issues into dispute.

> **B. Trooper Cook is entitled to judgment as a matter of law on Count I because an objectively reasonable officer could have believed that Tiffany Hupp violated W. VA. CODE § 61-5-17(a).**
>
> > **1. Plaintiffs' assertion that Buddy actually was harmless lacks merit and is in any event irrelevant.**

It is important to keep in mind the sole purpose for which Tiffany Hupp asserts that Trooper Cook should have ignored the warnings that Myers's neighbors had given him about Buddy and instead concluded that Buddy was a harmless old lap dog: Notwithstanding the fact that Plaintiffs' Response reads like an excessive force claim by a dog, Hupp asserts Buddy's supposed benignancy for the sole purpose of arguing that in drawing his gun, Trooper Cook was not "acting in his . . . official capacity" as that phrase is used in W. VA. CODE § 61-5-17(a), and, thus, that Hupp was not guilty of obstruction.[6]

As Defendants explained in their motion and in their response to Plaintiffs' motion, Trooper Cook's assessment of the threat that Buddy posed and his response thereto are irrelevant as a matter of law to Hupp's unlawful arrest claim, at the very least because she was not privileged to prevent what she says was the imminent seizure of Clifford Myers's effect. But even if that were not so, Hupp still has not identified any evidence sufficient to strip Trooper Cook of qualified immunity.

Plaintiffs identify what they believe is evidence that someone who knew a lot more about Buddy than Trooper Cook did might have concluded that Buddy was harmless. Specifically, they allege that "[t]he *witnesses who know Buddy*, and a dog expert *who met Buddy*

---

[5] (*See id*.) The Video *does* show, however, that as Cook walks towards the house, he jumps back, obviously startled by what he says, *without contradiction*, was Buddy approaching him.
[6] Clifford Myers raises the issue in an effort to support his "seizure of a dog" claim in Count XI. The fact that it is undisputed that Trooper Cook never seized Buddy alone is enough to dismiss Count XI.

3

for the first time, disagree with Cook's description of Buddy as aggressive."[7] But it is undisputed that Trooper Cook did *not* "know" Buddy, nor had he "met" Buddy. They say that "Buddy sleeps inside with his human family at night,"[8] that Buddy "usually spent his time with Tiffanie Hupp and her small child, [R.H.],"[9] that Ryan Hupp described Buddy as " 'a coward' . . . that . . . 'obviously' 'wouldn't bite' Cook,"[10] and that Buddy was ten years old at the time of the incident. Never once, though, do Plaintiffs allege that Trooper Cook knew—or that, much less how, an objectively reasonable officer would have known—*any* of this (or why they seem to believe that a ten-year old dog is *per se* harmless).

They say that their expert opined that "it takes quite a bit of time for an aggressive dog to calm down."[11] But they do not allege that Trooper Cook should have known this. Presumably because, Plaintiffs believe, the Video shows that Buddy calmed down, they are saying that Cook should have *then* concluded that Buddy had not moments *earlier* been a threat to him. Again, however, Plaintiffs are answering the wrong question, and worse, they are crediting him with the ability to somehow know something that had not yet happened.

They argue that Cook might have used his pepper spray or baton, saying that Cook should have rolled the dice with his safety in confronting a large dog, known to him to be vicious, standing just feet away, because the baton "almost certainly" would have been prevented Trooper Cook from being seriously injured if Buddy had attacked.[12] As detailed in Defendants' motion, Cook explained exactly why those were not safe options. In any event, all Plaintiffs

---

[7] (Pls.' Resp. at 9 (emphasis added).)
[8] (*Id*.)
[9] (*Id*. at 9–10.)
[10] (*Id*. at 10.)
[11] (*Id*. at 8.)
[12] (*Id*. at 10.)

4

have done is offer an expert who opined that using OC or a baton would have been reasonable, not that drawing a gun was so unreasonable that that act was outside of his official duties.

Plaintiffs say that Buddy was tethered and wagging his tail,[13] but they argue only that Cook knew Buddy was tethered *before Hupp fell*.[14] They never allege that Cook knew that Buddy was tethered at the only points that might conceivably have mattered: *i.e.*, when he drew his gun in preparation to defend himself, and right when Hupp stepped in between Cook and Buddy (her first completed act of obstruction).

Plaintiffs allege that Trooper Cook following Hupp to the house was unreasonable[15] (despite both of their experts admitting it *was* reasonable[16]) and that he should not have been surprised when Buddy lunged at him and started barking.[17] Again, however, Plaintiffs are answering the wrong question. The only conceivable independent relevance any of this could have is whether an officer who, in a way that he might have avoided, encounters a large, barking dog that he has just been told is vicious and then reacts accordingly is acting so far outside of his "official duties" that a stranger is privileged to obstruct the officer defending himself from the dog without violating W. VA. CODE § 61-5-17(a). Hupp cites no law for this (obviously wrong) argument.[18]

---

[13] (*Id.* at 1 and 7.) Plaintiffs allege that Trooper Cook "admitted that Buddy was chained on a tether." (*Id.* at 7.)
[14] (*See, e.g.*, *id.* at 12.)
[15] (*Id.* at 1.)
[16] (*See, e.g.*, S. DeFoe Dep. at 40–41 (attached hereto as Ex. F) ("Q: So, you don't have an opinion one way or the other whether it was lawful for Trooper Cook to enter the yard when Lindsey Myers was going to obtain Clifford Myers' identification? A: I don't believe that it was unlawful. I don't believe it was unlawful for him to accompany her, ultimately. . . ."); J. Crosby Dep. at 18 (attached hereto as Ex. H) (admitting Trooper Cook's entering the yard to accompany Lindsey Myers getting Clifford Myers's driver's license was constitutional).)
[17] (Pls.' Resp. at 6–7.)
[18] Plaintiffs also badly mischaracterize the evidence. They say that "[a]t trial, Cook admitted that he first saw Buddy 'out across the road' from him." (*Id.* at 6.) It is clear from the testimony that Cook is calling Myers's driveway "the road" and that Cook thus first saw Buddy when he crossed the driveway. Plaintiffs rely on a still frame captured from the Video for the proposition that Buddy was in "plain sight before Cook entered the yard." (*Id.*) This, too, if absolutely false. The frame is taken when Troopers Cook and Michaels are on the other side of Myers's SUV dealing with him, and it completely blocked their view of where Buddy briefly paused. (*See, e.g.*,

5

Plaintiffs say, "In his deposition, Cook admitted that Buddy was *not* advancing, saying he and Buddy were in what he calls a 'Mexican standoff.' "[19] This is just another blatantly misleading allegation. Plaintiffs are arguing that Cook should not have drawn his gun, but Trooper Cook was talking about *after he had already drawn his gun*.[20]

Finally, as Defendants detailed in their motion, Hupp's allegation that her imaginary heroism "likely saved Buddy's life"[21] is as irrelevant as it is false and offensive.

### 2. An objectively reasonable officer could have concluded that Cook was obstructing.

In an effort to avoid the truth, Plaintiffs continue to allege only that Cook asked "those present,"[22] "people,"[23] or "someone"[24] to control Buddy, pinning their hopes on one single occurrence where Cook said he asked "them."[25] As Cook testified, he asked only one "people" "present" to control Buddy: *i.e.*, Clifford Myers. The sole relevance of this is that it supports the objective reasonableness of his belief that Hupp was not there to help but to interfere. Furthermore, as Defendants discussed in their Motion, as the Video shows, as Hupp herself even admits, helping Trooper Cook[26] was the farthest thing from Hupp's mind.

Irrelevant, too, are Hupp's assertions that if only Trooper Cook had given her just a few more moments, she would have switched from obstructionist to "fully compliant and

---

S. Cook Dep. at 14 (attached hereto as Ex. I) (first saw Buddy as he entered yard); *id.* at 27 ("Q: Okay. And you're assessing the situation, but you didn't see Buddy in the yard? A: Not from where I was standing. . . . Q: Yeah. But you didn't see Buddy. A: Not from my point of view."); D. Myers Dep. at 45–47 (attached hereto as Ex. B) (admitting that Cook is on one side of Myers's SUV and Buddy is on the other).)

[19]  (Pls.' Resp. at 12 (citing S. Cook Dep. at 35).)
[20]  (*See* S. Cook Dep. at 35.)
[21]  (Pls.' Resp. at 3 and 18.)
[22]  (*Id*. at 2.)
[23]  (*Id*. at 12.)
[24]  (*Id*.)
[25]  (*Id*. at 17 n.1.)
[26]  (*Id*. at 12 and 17.)

responsive" helper.[27]  As Defendants explained, even if a jury were to believe Hupp's literally incredible assertion, it would not matter, because her act of obstructing was complete when she stood between Trooper Cook and Buddy, and she was not entitled to a free warning, as she seems to believe.  Likewise, Hupp's invocation of cases about whether mere speech can constitute obstructing[28] remains inapposite:  as Defendants also demonstrated in their Motion, Hupp did more than merely "walk[] down the hill and ask[] Cook not to shoot."[29]

### C. Trooper Cook is entitled to judgment as a matter of law on Count II because an objectively reasonable officer could have believed that the *de minimis* force he used in moving and then arresting Ms. Hupp was reasonable.

Defendants have thoroughly addressed Hupp's excessive force claim.  Tiffany Hupp's encounter with Trooper Cook lasted just seconds, a fact that counsels strongly against the application of excessive post-hoc second-guessing.[30]  Either Hupp is saying that she was not arrestable and thus that no force at all was reasonable, or that even if she was arrestable, Trooper Cook nonetheless used excessive force to effect her arrest.[31]  Both arguments lack merit.  If she is arguing the former, then as Defendants demonstrated, the predicate is wrong:  an objectively reasonable officer could easily have believed that Hupp was obstructing.  And if she is arguing the latter, then as Defendants also demonstrated, Trooper Cook's use of the least force imaginable to effect her arrest was also reasonable;  indeed, it is hard to imagine Cook using any less force to get Hupp out of the way and take her into custody.

---

[27]  (*Id*. at 12–13;  *id.* at 20.)
[28]  (*See, e.g.*, *id*. at 18.)
[29]  (*Id*. at 2–3.)
[30]  *See, e.g.*, *Kisela v. Hughes*, No. 17-467, 2018 WL 1568126, at *4 (U.S. Apr. 2, 2018) (recognizing that the fact that "the situation unfolded in less than a minute" matters for qualified immunity purposes).
[31]  (Pls.' Resp. at 18 and 20–21.)

7

> **D. Trooper Cook is entitled to judgment as a matter of law on Counts III and IV because an objectively reasonable officer could have believed that Trooper Cook's role in Ms. Hupp's prosecution was reasonable.**

Hupp repeatedly accuses Trooper Cook of lying, both in the criminal complaint against her and at her trial. But *none* of Hupp's baseless accusations in any way undercuts Cook's entitlement to qualified immunity. As discussed, Hupp is badly misusing what the Video *could not show* to say that it *did not happen*: It is clear that the things that Trooper Cook testified about were either (1) not within what the Video could possibly have captured (because they happened before or after the Video, or were out of the Video's audio or video range), or (2) clearly did *not* happen the way Hupp mischaracterizes them as having happened.

Hupp says that the Video proves that Trooper Cook lied when he testified that he drew his gun in response to Buddy growling, snapping, and approaching him.[32] The Video does *not show* Buddy before Cook drew his gun. Why Hupp thinks that this somehow disproves Cook's testimony is incomprehensible.

Hupp says that the Video proves that Trooper Cook lied when he testified that he gave her orders to move and tried to move her aside before she fell and he arrested her.[33] But the Video clearly shows Cook saying something to Hupp—the recording did not capture anything that either Cook or Hupp spoke to each other—before she fell. Even Hupp does not believe this, only willing to speculate that Cook "likely" did not order her to step back.[34] This is undoubtedly because her husband directly contradicts her half-assertion.[35]

---

[32] (*See, e.g.*, *id.* at 4.)

[33] (*See, e.g.*, *id.*)

[34] (*Id.* at 12.)

[35] (*See, e.g.*, R. Hupp Dep. at 36–38 (attached hereto as Ex. C) ("Q: Did you hear her saying the trooper say something like, you need to step back or anything like that? A: Yes, I think he did. I think—he didn't say that. He said—he said move. I think, move out of the way or something. . . . At that time, when she jumped [in] front of the gun. . . . That's when he said that. . . . Q: When she jumped in front of the gun, the trooper said something? A: I heard him say, move, move out of the way or something. . . . Yeah, he said move out of the way, get out of the way, move out of the way, something like that. One of them.").)

Hupp sets in table form what she says are eight lies that Trooper Cook told.[36] As the Video and other undisputed evidence shows, her accusations are entirely baseless. Hupp say that Trooper Cook lied when he testified that he drew his gun in response to Buddy approaching and snarling at him. She say the Video shows this. That is false. As noted, the Video does not show Buddy right before Cook drew his gun. And it only barely recorded Buddy barking when he cannot be seen; it does *not* even suggest that Trooper Cook was lying.

Hupp say that Cook lied about giving her orders because the Video shows that "[t]here was no time for an order to be given before Cook grabbed Hupp."[37] That is also false. The Video clearly shows Cook giving Hupp some kind of orders (they cannot be heard) while trying to move her out of the way, *then* she falls.

Hupp says that Cook lied about Hupp refusing to comply with the order that he had just given her to move, and raising her hands towards him, because, she says, the Video shows that "Cook grabbed Hupp while her arms were by her side."[38] That, too, is false. The Video shows Cook trying to get Hupp out of the way, *then* she raises her hands toward him, *then* she falls down and he arrests her.

Hupp says that Trooper Cook lied about Hupp grabbing him and then cursing at him, because the Video shows that "Hupp did not grab Cook."[39] Again, false. The Video shows that after Cook gave her an order, when he tried to get her to move, she briefly grabs Cook. In fact, Hupp *admitted* that she grabbed Cook.[40] And as discussed, the fact that the Video did not

---

[36] (Pls.' Resp. at 14–15.)

[37] (*Id.* at 14.)

[38] (*Id.*)

[39] (*Id.*)

[40] (T. Hupp Rec. Stmt. at 5 (attached hereto as Ex. D) ("Q: You got ahold of my shirt and stuff and was—you were screaming profanities at me. A: I know I was falling—no, I really didn't think you would take that as like trying to hit you or anything like that. My flip-flop broke, as you saw, and we were on a hill ***and wanted to hold onto you instead of falling down to the ground***.") (emphasis added).)

capture Hupp cursing proves nothing, because it did not capture either of them speaking to the other because of the distance and a loud video game is playing in the background.

The same is the same is true of Hupp's mischaracterization of what the evidence says about Cooks testimony at her trial[41]: The Video does *not* disprove Cook's testimony that he drew his gun in response to Buddy coming at him and snapping; it does *not* disprove that he ordered her to move when it clearly shows he did say something to her; the Video *does* show that Hupp briefly grabbed Cook, *as she admitted*; and the Video does *not* prove that she was not cursing at him as she fell.

Hupp argues that Trooper Cook failed to disclose what she calls "exculpatory evidence" to the prosecutor,[42] but as already discussed, nothing that she wanted the prosecutor to have was relevant to making an element of her criminal offense more or less likely.

Hupp alleges that Trooper Cook "influenced" the prosecutor to prosecute her.[43] Her sole "evidence" is that she asks the Court to draw an adverse inference from Trooper Cook not turning over his conversation with the prosecutor, a matter still subject to a pending discovery dispute. That is improper. Hupp also asks the Court to allow an inference that since sometimes police officers "nudge" prosecutors about decisions to prosecute, that happened in this case. All Hupp has is rank speculation.

Worst for Hupp, after saying that the Video shows all there is to know about what happened, she fails to note the prosecutor *had the Video*. So even if, as Hupp offensively alleges, Cook lied right and left about what happened, Hupp has not a shred of *evidence* that the prosecutor's decision to prosecute was not fully informed. What the Video and Cook's

---

[41] (Pls.' Resp. at 14–15.)
[42] (*Id*. at 23.)
[43] (*Id*. at 15; *id.* at 21, 23.)

10

undisputed testimony *do* show is that an objectively reasonable police officer could easily have concluded that Hupp was there to obstruct and that that is exactly what she did.

Finally, Hupp says that Cook's role in investigating *another police department's* discovery of disturbing child pornography on one of the phones proves that he had malice toward Hupp.[44] Troublingly, Hupp tries to minimize the significance of Parkersburg Police Department Detective Wolfe finding what he believed to be homemade child pornography, calling it "alleged 'child porn'" and "nonsense."[45] It is *undisputed* that there was nothing "alleged" about the material found on one of the phones. If Hupp is suggesting that the fact that Cook learned *after* the investigation concluded that the pornography was not the fault of any of the Myerses, that hardly makes his decision to investigate what the other department found evidence that he harbored "malice" toward her. Hupp's decision to characterize Cook's investigation of that material as "nonsense" says a lot about her, but it says nothing about Cook's decision.

### E. C.R. Smithers is entitled to judgment as a matter of law on Counts V and VI because Ms. Hupp has no evidence of the elements of her claim.

As the Court observed in *Spry v. W. Virginia*, No. 2:16-CV-01785, 2017 WL 440733 (S.D. W. Va. Feb. 1, 2017):

> *[r]espondeat superior* cannot be used to impart liability to a supervisory official under § 1983. [*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)] ("[G]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). This rule applies with equal force to alleged violations of West Virginia civil rights law. Syl. Pt. 1, *Robinson v. Pack*, 679 S.E.2d 660 (W. Va. 2009) (adopting *Iqbal*'s holding to find that a supervisory police officer is only liable for his own actions and not those of his subordinates).
>
> Since vicarious liability is inapplicable to § 1983 and related state law claims, a plaintiff must plead that a supervisor's own actions violate the Constitution. *Iqbal*, 556 U.S. at 676; *see*

---

[44] (*Id.* at 23–24.)
[45] (*Id.*; *but see* T. Wolfe Dep. at 15–20 and 30–32 (attached hereto as Ex. E).)

11

> *Deakins v. Pack*, 957 F. Supp. 2d 703, 761 (S.D. W. Va. 2013) ("A supervisor's mere knowledge of a subordinate's unconstitutional conduct is not enough. . . . Section 1983 liability may be imposed upon a supervisor only on the basis of purposeful 'violations of his or her supervisory responsibilities.' " (*quoting Iqbal*, 556 U.S. at 676)). In *Shaw v. Stroud*, the Fourth Circuit set forth the elements necessary to establish such a claim for supervisory liability under § 1983:
>
>> 1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>>
>> 2) The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and
>>
>> 3) There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.
>
> 13 F.3d 791, 799 (4th Cir. 1994) (citation omitted).

2017 WL 440733, at *5.

Hupp correctly notes that deliberate indifference can be shown by a "pattern of constitutional violations" or a supervisor's "failure to train [his] employees concerning an obvious constitutional duty that the employees are certain to face."[46] But she fails to identify any evidence that might establish a pattern of constitutional violations or training deficiencies by Smithers. Hupp make four arguments why Smithers was deliberately indifferent. None of her arguments defeats Mr. Smithers's entitlement to qualified immunity.

---

[46] (Pls.' Resp. at 29 (citing *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989)).)

First, Hupp argues that, despite knowing that "his officers regularly interact with dogs," Mr. Smithers "did not implement additional training regarding dogs."[47] To support her this claim, Hupp cites Smithers's testimony:

> Q   And *other than the annual in-service* where there was a discussion, do you have any other memories of where you instituted different or additional training about dealing with animals?
>
> A   Not that I recall.

(J. Smithers Dep. at 72 (attached hereto as Ex. A).)  Hupp thus *expressly ignores* the fact that Trooper Cook *did* receive in-service training, training from the West Virginia State Police canine handler, dedicated to how to handle dogs and identify aggressive ones.[48]  In fact, Hupp's criticism of Mr. Smithers is a little hard to follow.  She argues that Smithers "did not implement additional training regarding dogs,"[49] but she then says that "[i]n the last week of February 2015, just two months before he pulled a gun on Buddy, Cook received training about how to tell friendly dogs from dangerous dogs."[50]

Furthermore, Hupp never identifies any source of a duty to specifically train officers on every, single thing that they might encounter in the field, as no such duty exists.  In fact, Hupp's police expert believes that Trooper Cook's training in uses of force was consistent with national standards and that specific training regarding canines is traditionally not part of an officer's training.[51]  Simply put, Hupp cannot establish that Mr. Smithers was deliberately

---

[47]   (Pls.' Resp. at 5.)  When Plaintiffs initially filed this civil action, they argued in support of their claims against Mr. Smithers that Trooper Cook was trained to "shoot any dog that approaches him" and "kill all dogs that approach him, even if the dog was chained and wagging its tail." (Compl. at ¶¶ 27, 65, and 74.)  After the evidence established that these allegations were patently false, they moved to amend their Complaint to explain, circularly, that they had mistakenly relied on media articles—articles that cited Tiffanie Hupp or her counsel as the source of the falsehoods—when they had made their allegations against Smithers. (Dkt. #22 and #23.)

[48]   (S. Cook Dep. at 9.)

[49]   (Pls.' Resp. at 5.)

[50]   (*Id*. at 10.)

[51]   (S. DeFoe Dep. at 19–20.)

13

indifferent to a training need when Trooper Cook received the very training that Hupp thinks he should have had, and the training in question went above and beyond national standards.

Second, Hupp argues that Trooper Cook's background should have kept him from getting hired or that his conduct during his time as a trooper should have demonstrated to Smithers a need for additional training. Again, however, Plaintiff's own police expert, who reviewed Cook's personnel file and professional standards history, disagreed, testifying that "there was nothing about Trooper Cook's background that indicated he should not have been hired as a police officer" or "that he should not have been a police officer on [the day of the incident]."[52] The commander of the State Police Professional Standards Unit, who investigates complaints against state troopers, noted that the only investigation about Trooper Cook prior to Plaintiff's arrest involved a simple auto accident.[53] The best Hupp can come up with as to Trooper Cook's prior conduct is that, while employed at another police agency, he shot a pit bull that had already been shot by another officer after attacking that officer. But Hupp does not even attempt to very link that different incident to "actual or constructive knowledge" by Smithers that Trooper Cook posed an "unreasonable risk" of constitutional injuries to her. Hupp has come forward with no evidence of any violent propensities that would have put Smithers on notice that Cook posed a danger to Hupp (or Myers's dog).

Third, Plaintiff seems to argue that the fact that the West Virginia State Police does not require a report every time a gun is drawn in some way indicates deliberate indifference on Smithers's behalf. Again, Hupp's own police expert disagrees, noting that nationally, police agencies do not require reports every time a gun is drawn.[54]

---

[52] (*Id*. at 22–23.)
[53] (C. White Dep. at 79–80 (attached hereto as Ex. G).)
[54] (S. DeFoe Dep. at 58-61.)

14

Last, Hupp argues that during his deposition, after reviewing the video, Mr. Smithers "ratified" Trooper Cook's conduct. By the time Smithers was deposed, he was retired, a private citizen. Whatever his beliefs were in his post-retirement deposition, that in no way demonstrates actual or constructive knowledge that while Smithers was with the State Police, he knew that Cook posed a risk before Cook interacted with Hupp. To prevail against Smithers, Hupp would have to show Smithers knew then that Cook posed a risk and failed to do anything about it. She has failed to come forward with any such evidence.

**F.     Trooper Cook is entitled to judgment as a matter of law on Counts VII and VII because Ms. Hupp has no evidence of the elements of her claim.**

Hupp has identified nothing to refute Defendants' discussion of why they are entitled to judgment as a matter of law on Hupp's outrage and battery claims.

**G.     Trooper Cook is entitled to judgment as a matter of law on Counts IX and X because an objectively reasonable officer could have believed that exigent circumstances required his brief entry into Clifford Myers's house to seize evidence of a crime.**

Counts IX and X fare no better, because Myers has not identified any evidence that an objectively reasonable police officer could not have believed that exigent circumstances justified the entry into Myers's house and seizure of his telephone.

Myers says that Trooper "Cook admits he understood that Ryan Hupp would not destroy the Video evidence."[55] That is just another false and misleading assertion. Trooper Cook "admitted" only that Ryan "*was glad he was recording*" the incident.[56] When asked, "And so you'd agree with me that ***that statement alone*** didn't suggest to you that he was going to get rid of something he was glad he had,"[57] Cook explained that while *that statement alone* suggests

---

[55]     (Pls.' Resp. at 4 (citing S. Cook Dep. at 74); *see also* Pls.' Resp. at 13.)
[56]     (S. Cook Dep. at 74 (emphasis added).)
[57]     (*Id.* (emphasis added).)

15

that Ryan was "not going to get rid of it [the Video],"[58] as he explained in his motion, destruction is not the sole justification for exigency—the risk of concealment also justifies a warrantless seizure—and Ryan's statement was *not* the only thing that Cook had to go on.

Myers argues that exigency did not exist because "[t]here was no danger in the home either, and thus no exigency."[59] This is a straw man. Defendants never argued that a danger to Trooper Cook created exigency.

And as Cook also addressed, Myers's argument that exigent circumstances did not exist because in other situations Trooper Cook subjectively believed exigency existed when Myers apparently believes it did not lacks merit because Trooper Cook's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."[60]

As for Count X (seizure), Myers says that "[t]he exigent seizure piggybacks, according to Cook, on the exigent entry."[61] Myers has this backwards. As demonstrated, because exigent circumstances required immediate seizure of the devices, Trooper Cook's entry was also reasonable.

### H. Trooper Cook is entitled to judgment as a matter of law on Count XI because he did not seize Buddy.

Myers only mentions Count XI in the title and conclusion sentence of § I.B.1 of his memorandum.[62] The only thing in that section that even arguably relates to Count XI is Myers's allegation that "Cook had no basis upon which to pull his gun on Buddy in the first place."[63] It is undisputed that Trooper Cook never seized Buddy in any way whatsoever. As

---

[58] (*Id.*)
[59] (Pls.' Resp. at 13.)
[60] *Whren v. United States*, 517 U.S. 806, 813 (1996).
[61] (Pls.' Resp. at 28.)
[62] Defendants believe in good faith that they have identified the correct section number. (Plaintiffs outline is a little hard to follow. There are two § II.Bs; § III.C has its own §§ A and B; and § III.D only has subsections §§ III.D.5, III.D.7, and III.D.8.)
[63] (Pls.' Resp. at 3.)

16

Defendants discussed in their motion, a dog does not know it has had a gun pointed at it, so doing so is not a "seizure" of the dog (like it might be of a person). Count XI lacks any merit.

## II. CONCLUSION

Plaintiffs are trying an old ploy: file a cross-motion for summary judgment, and then throw out enough half-truths, mischaracterizations, outright falsities, and irrelevant allegations to make it seem like surely *something* must be reasonably disputed, all in an effort to get both motions for summary judgment denied. But the fact remains that they have not identified any evidence that an objectively reasonable police officer knowing what Trooper Cook had been told and facing the circumstances that Trooper Cook faced, could not have believed the reasonableness of Trooper Cook's decision to draw his weapon, arrest Tiffany Hupp for obstruction, and enter Clifford Myers's home to seize what Cook believed was evidence of Hupp's crime that he was about to lose.

Accordingly, Defendants respectfully request the Court to **GRANT** Defendants motion and **ORDER** that summary judgment be entered in Defendants' favor.

**SETH COOK** *and* **C.R. "JAY" SMITHERS,**
By counsel,

**/s/ Michael D. Mullins**

**STEPTOE & JOHNSON PLLC**
*Of Counsel*

Michael D. Mullins (W. Va. Bar No. 7754)
*michael.mullins@steptoe-johnson.com*
Robert E. Ryan (W. Va. Bar No. 8596)
*robert.ryan@steptoe-johnson.com*
Robert L. Bailey (W. Va. Bar No. 8902)
*robert.bailey@steptoe-johnson.com*
707 Virginia St. E. 17th Floor
P.O. Box 1588
Charleston, W. Va. 25326-1588
(304) 353-8000 (voice)
(304) 353-8180 (facsimile)

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

**TIFFANIE HUPP**, **R.H.**, *a minor, by and through his next friend, Tiffanie Hupp*, *and*
**CLIFFORD MYERS,**
    *Plaintiffs,*

v.

**STATE TROOPER SETH COOK** *and*
**COLONEL C.R. "JAY" SMITHERS,**
    *Defendants.*

No. 2:17-CV-926
Hon. Thomas E. Johnston

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2018, I served the foregoing "*Defendants' Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment*" with the Clerk of the Court using the CM/ECF system, which will send electronic notification of such filing to:

Alene Anello
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, CA 94931
914/844-5447
Fax: 707/795-7280
Email: aanello@aldf.org
    *Counsel for Plaintiffs*

David O. Schles
Suite 306
815 Quarrier Street
Charleston, WV 25301
304/344-1559
Fax: 304/344-2339
Email: Schles_law@wirefire.com
    *Counsel for Plaintiffs*

John Eric Campbell
UNIVERSITY OF DENVER
STURM COLLEGE OF LAW
2255 East Evans Avenue
Denver, CO 80208
314/588-8101
Fax: 314/588-9188
Email: john@campbelllawllc.com
    *Counsel for Plaintiffs*

Justin F. Marceau
UNIVERSITY OF DENVER
Ricketson Law Building
2255 East Evans Avenue
Denver, CO 80208
617/256-9073
Email: jmarceau@law.du.edu
    *Counsel for Plaintiffs*

    /s/ Michael D. Mullins

7986259